**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| EXCITING BRAND HOLDINGS LLC, | ) | |
| ORA-ANNE JARVIS and | ) | |
| ROBERT BENNETT, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| and | ) | JURY TRIAL DEMANDED |
| | ) | |
| FRANCHOICE, INC., | ) | |
| and MATT STEVENS, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiffs, Exciting Brand Holdings LLC, Ora-Anne Jarvis and Robert Bennett, for their complaint against Defendants FranChoice and Matt Stevens allege as follows:

### Nature of Demand

1. This is an action by a franchisee, Exciting Brand Holdings LLC and its principals, Ora-Anne Jarvis and Robert Bennett, against its franchise broker FranChoice, Inc. and FranChoice's representative, Matt Stevens, to recover damages as a result of the fraud, misrepresentations, and violations of the New York State Franchise Sales Act in connection with the Plaintiffs' purchase of rights to a franchise for "iLoveKickboxing.com" franchise. In summary, the Defendants wrongfully induced the Franchisee to purchase the franchise on the basis of false representations of the potential profits and earnings of the franchise, and certain other misrepresentations, in violation of the New York State Franchise Sales Act and common law.

1

**<u>Jurisdiction and Venue</u>**

2.     This Court has jurisdiction of this case pursuant to 28 U.S.C. § 1332(a) in that the parties are of diverse citizenship and the amount in controversy exceeds $75,000 exclusive of interest and costs.

3.     Venue is proper in this District because a substantial number of events and transactions giving rise to these claims occurred here.

**<u>Parties</u>**

4.     Exciting Brand Holdings LLC is a New Jersey limited liability company, with its principal place of business in New Jersey.  It was formed by Ora-Anne Jarvis and her husband, Dr. Robert Bennett, for the purpose of purchasing an "iLoveKickboxing.com" franchise. (Exciting Brand Holdings LLC, Jarvis and Bennett will be referred to collectively as "Franchisee").

5.     Ora-Anne Jarvis and Dr. Robert Bennett are individual citizens of New York.

6.     FranChoice, Inc. is a corporation formed under the laws of a state other than New York with its principal place of business in Eden Prairie, Minnesota.  It is engaged in the business of representing franchisors for the purpose of selling franchises to prospective franchisees.  FranChoice holds itself out to prospective franchisees as a consultant that will assist them in finding a franchise opportunity that will be appropriate to their desires and needs.

7.     Matt Stevens is an individual citizen of Ohio and was at all relevant times a representative of FranChoice who was instrumental in the sale of the franchise to the franchisees.

8.     Non-Party ILKB, LLC is the franchisor of "iLoveKickboxing.com" franchises, which are fitness facilities dedicated to kickboxing, a form of physical fitness.

9. Non-Party Michael Parrella is the manager and Chief Executive Officer of ILKB.

10. Non-Party Scott Ferrari is the Director of Franchise Development at ILKB and President.

**Facts**

11. Ms. Jarvis and Dr. Bennett became interested in purchasing a franchise in late 2013 or early 2014; they engaged FranChoice and, in turn, Mr. Stevens, to assist them in finding appropriate opportunities. FranChoice held itself out as directing prospective franchisees to "high quality franchise businesses that match your requirements" and that would match "entrepreneurs like you with the perfect franchise business." FranChoice stressed that Ms. Jarvis and Dr. Bennett could "avoid the confusion of researching" franchise opportunities and could focus on those franchises that FranChoice had "selected …as franchise businesses matching [their] requirements."

12. In 2014, FranChoice and Mr. Stevens introduced Ms. Jarvis and Dr. Bennett to ILKB. Ms. Jarvis and Dr. Bennett were initially interested in establishing a location in Manhattan; ILKB told them that Manhattan was reserved for corporate development, but that they would do just as well with locations in New Jersey, just across the Hudson River. After preliminary discussions, Ms. Jarvis and Mr. Bennett attended a Discovery Day at ILKB headquarters on August 21 and 22, 2014 for the purpose of familiarizing them with ILKB as a franchisor. At or about the time of Discovery Day, ILKB provided to Ms. Jarvis and Dr. Bennett a copy of ILKB's Franchise Disclosure Document ("FDD"). The FDD is a document that the Federal Trade Commission requires that franchisors provide to prospective franchisees containing certain required disclosures about the franchisor, such as the identities of its principals, its litigation and bankruptcy history, requirements

3

of the franchise agreement, and the franchisor's financial statements.  16 CFR Part 426.

New York State also regulates the sale of franchises and requires that the franchisor not

only provide an FDD to the prospective franchisee prior to purchase of the franchise, but

also requires that the franchisor register the FDD with the Attorney General of New York

State.  N.Y. Gen. Bus. L. §680 *et seq.*  The FDD furnished to Franchisee was effective in

New York State on May 22, 2014.

**Defendants' Misrepresentations**

13.    Prior to and at Discovery Day, ILKB, Mr. Parrella, FranChoice, Mr. Stevens

and Mr. Ferrari made the following representations regarding the franchise.

<u>Financial Performance Representations</u>

14.    The Defendants made the following representations concerning the

financial performance of the franchise:

a.    Early on in the process of selecting a franchise, in June 2014, Mr. Stevens confirmed to Ms. Jarvis that ILKB met the Franchisee's goal of achieving a return on investment within one year.  Shortly thereafter, after the Franchisee confirmed interest in ILKB, Stevens told Ms. Jarvis that only 200 customers would be needed to break even and that the concept was profitable with 300 customers.  He contrasted ILKB favorably to Planet Fitness, which requires thousands of customers to break even. He then emphasized that with ILKB headquartered in Long Island, it had specialized knowledge of the surrounding New York and New Jersey markets and the real estate issues in those markets.  Mr. Stevens also presented ILKB as suitable for absentee ownership.

b.    At Discovery Day, in the presence of several other candidates, Mr. Parrella made a whiteboard presentation that showed that franchisees could break even at 200 members, based on an average membership price of $135; that each member beyond 200 generated 80 percent profit; and that break-even could be achieved in three to five months.  The presentation went on to state that with 100 additional members, which Mr. Parrella represented as achievable, the Franchisee would make a profit of $132,000 per year.

4

c.      Echoing statements made by Mr. Ferrari on telephone calls with the Franchisee, Mr. Parrella stated at Discovery Day that the ILKB "concept" was designed to generate a six-figure income for the owner and that it in fact did that.

d.      Elaborating on the six-figure income claim, Mr. Ferrari told the Franchisee, in telephone conversations, that a location in New Jersey would do almost as well as one in New York City, and that if the Franchisee purchased three locations, each would generate $150,000 a year in profits, with a total income of $450,000 per year. Mr. Ferrari asked Ms. Jarvis rhetorically, "Is that enough?"

e.      In June 2014, Mr. Ferrari claimed in telephone calls that the rent for an ILKB outlet should be approximately $5,500 per month. When the Franchisee discovered that rent in New Jersey was substantially higher, Mr. Ferrari responded, "So you're going to make $135,000 a year [per unit] versus $150,000. What's the big deal?"

f.      Prior to and at Discovery Day, Mr. Ferrari directed the Franchisee to a YouTube video dated May 1, 2014 in which other franchisees made further financial performance representations including:

-    "In the last year, since we have been part of the franchise, we have increased our gross by 40 percent."

-    "We've increased our bottom line by six figures each."

-    "Our classes are full."

-    "I think we had 66 memberships the first month. We've been consistently above 70 memberships."

    The video is located at:
    https://www.youtube.com/watch?v=tzWsQY1DBJI

g.      At Discovery Day, Mr. Parrella and Mr. Ferrari told the Franchisee that it could sell developed or undeveloped territories at any time, and that it would make money because the franchisor was increasing prices; thus, the value of the franchise would increase. Further, Mr. Parrella represented that "at the height of the market, you'll be able to sell for multiples of what you invested in the business."

h.      At Discovery Day, Mr. Parrella represented that the "pro shop," while not the main source of revenue, was a "great add-on" that would generate additional income, and that ILKB would be adding new products and gear for sale shortly.

i. Throughout all of these representations, the Franchisor never mentioned any membership attrition issues or issues with bad debts in the form of delinquents, declines and cancellations (collectively "attrition").

j. Throughout the summer and fall of 2014, Mr. Stevens reiterated the break even and profit figures to Ms. Jarvis, while encouraging her to go forward with the franchise purchase.

Representations about Demographics

15. The Defendants also made representations about demographics as follows:

a. Although the Franchisee was specifically interested in establishing a franchise in Manhattan, Mr. Ferrari repeatedly told them that New Jersey would be just as good; in fact, Mr. Ferrari told Ms. Jarvis that she could be the "Queen of New Jersey." When locations in densely-populated areas such as Hoboken proved unavailable, ILKB encouraged the Franchisee to establish a franchise in more remote and less populated locations. The Franchisee eventually located in East Hanover, New Jersey.

b. The 2014 YouTube video contains repeated representations that ILKB franchises did well in small towns and moderately-populated locations.

c. In May, 2015, after negotiating with the landlord for space in East Hanover, the Franchisee had an opportunity to back out of the lease and, having seen the territory and obtained demographic information, questioned whether it would be viable. Mr. Ferrari responded in an email dated June 1, 2015 that the demographics were "great" and that the Franchisee should "move forward with full confidence."

d. At no time did the Franchisor disclose that a high-density population surrounding the franchise was essential to success.

Representations About the Franchisor's Effectiveness at Marketing

16. Defendants also made the following representations about the franchisor's effectiveness at marketing.

a. Also at Discovery Day, Mr. Parrella represented that ILKB would handle all marketing for the Franchisee and "drive traffic to your door."

b.      The 2014 video reinforced these statements with franchisees stating:

-       "[Marketing is] plug and play; it's ready to go for you."

-       "They [ILKB] do the social media; they do the marketing; they do all the Groupon stuff.  They have it plug and play; it's ready to go."

c.      On Discovery Day, Mr. Parrella and Mr. Ferrari said that the franchisor had a "secret sauce" that was search engine optimization ("SEO") that would optimize the Internet search results and "drive people to the website."  In the course of this discussion, Mr. Ferrari showed the Franchisee a windowless room filled with employees at computer screens that he referred to as "ninjas" who did the website development and Adan de la Cruz, the SEO expert who would be "driving internet traffic to your website."

d.      Kelly Murray, ILKB's Director of Franchisee Training told Ms. Jarvis and Dr. Bennett at Discovery Day that the Franchisee's manager should be able to convert leads at a rate of 70 percent; if the manager could not reach that figure, ILKB would come in, remove him and put someone in who could do that.  Ryan Anthony, Franchise Launch Coordinator, Ryan Healy, Vice President of Operations were also there, along with Vinny Iufreddo, Director of Franchise Operations.

Representations about Costs of Advertising

17.     The Defendants made the following representations about costs of advertising:

a.      The FDD states that the fees for advertising and promotion include grand opening advertising of $2,500 to $3,500; approximately $3,000 per year on "referral and transformations contests and promotions;" one percent of gross revenues as a marketing fee; and "up to 100% of initial vendor payments" from lead generation programs.

b.      During Discovery Day, however, Scott Ferrari stated that the franchisor did not collect the 1 percent marketing fee: "We just put it there; we have no plans to take it."

c.      Mr. Parrella told the Franchisee (confirmed in a written Business Plan later sent to Franchisee), that the cost to acquire a member was $40.

7

<u>Representations about the Characteristics of the Franchise</u>

18.     The following representations about the characteristics of the franchise were made by the Defendants:

a.      Both the Franchisor and Mr. Stevens repeatedly represented that the franchise was suitable for absentee ownership; Mr. Stevens gave specific examples of multi-unit absentee franchisees.

b.      Mr. Parrella represented to the Franchisee that the business was not seasonal; that kickboxing was not a "fad" and that members remained with the franchise for approximately a year; Scott Ferrari, responding to a specific inquiry by Ora Jarvis, stated that price was not an issue for membership, "our prices are in line with yoga and Pilates."

c.      At Discovery Day, Mr. Parrella presented and outlined labor costs to attendees; Ms. Jarvis asked if these costs should not be marked up by a third to cover the expenses, such as employer tax contributions and ILKB's suggested health insurance, of carrying the employees. Mr. Parrella responded "No" and continued to say that only four to five people were necessary to run the business.

d.      The FDD states that initial training for the general manager and one kickboxing instructor is included.  No charges for additional training are listed.

e.      Mr. Ferrari told the Franchisee East Hanover, New Jersey had good demographics and that the franchisees should proceed with that location.

f.      Mr. Ferrari also stated that there were no mark ups on products sold to franchisees, including software.

<u>The FDD's Misrepresentations About Litigation and Bankruptcy</u>

19.      The FDD provided to the Franchisee contained the following disclosures about the litigation and bankruptcy history of ILKB and its principals:

a.      "Neither ILKB …nor any person…identified in Item 2 of this prospectus has been…within the 10-year period immediately before the application for the registration … held liable in a civil action by final judgment or been the subject of a material complaint … if the …legal proceeding involved … fraud, ... fraudulent conversion… unfair or deceptive practices, misappropriation of property or

8

comparable allegations…."

b.    "During the 10 year period immediately before the date of this prospectus, no person previously identified in Items 1 or 2 of this prospectus has been adjudged bankrupt or reorganized due to insolvency…."

Michael Parrella was identified in Item 2 of the FDD as the Manager and Chief Executive Officer of ILKB.

<u>Use of Validation Lists</u>

20.    The Franchisor provided the Franchisee with "Validation Lists," consisting of contact information for specific franchisees, chosen by the Franchisor to speak to prospective franchisees.  The Franchisee was encouraged to speak only to these franchisees for "validation" of the franchisor's representations, and these franchisees confirmed the Franchisor's representations and encouraged the Franchisee to invest in the ILKB franchise.  For example, the Las Vegas franchisee told the Franchisee that break-even occurred within five months; that he had three locations with over 500 customers; that retention was 70 to 80 percent and that conversion of website specials was 70 to 80 percent.  Additionally, the franchisor also offered to franchisees pre-recorded "validation calls" to permit them to "listen in" at any time on other franchisees discussions with the franchisor's hand-picked franchisees.

**Plaintiffs' Reliance**

21.    In reliance upon the representations of the franchisor, its officers, its broker and the validating franchisees, the Franchisee invested $90,000 in development fees for three franchises; $155,000 in outfitting the East Hanover location; and undertook substantial lease obligations. The outlet opened on October 10, 2015.

9

22.    Had the representations of Messrs. Parrella, Ferrari and of ILKB concerning the franchise's revenue and profitability been true, the Franchisee would have had annual profits for three units totaling $450,000 for a period of 5 years, or a total of $2.25 million.

23.    Contrary to the representations made, the outlet has not been profitable in a single month since opening; it has accumulated operating losses in excess of $100,000, which are continuing, and the franchisee owes a minimum of $200,000 on its lease.

### The Falsity of Defendants' Representations

24.    After opening the business, the Franchisee learned that the representations that ILKB Mr. Parrella, Mr. Ferrari, FranChoice, Mr. Stevens and others had made to it were not true:

a.    The repeated financial performance representations, including the statements made by franchisees on the 2014 YouTube video, lacked any reasonable basis; they were in fact contradicted by performance information of which ILKB was aware that was provided by existing franchisees; the representations were not included in the FDD as required by N.Y. Gen. Bus. L. 680 *et seq.*; did not provide the information required by 16 C.F.R. § 436.1(b)(c) or (d); and did not contain any of the language dictated by 16 C.F.R. § 436.1(b)(4).

b.    The pro shop did not generate additional revenue of consequence, and ILKB failed to adequately stock items for sale.

c.    Most significantly, ILKB never disclosed that attrition made it impossible to attain or maintain the levels of membership represented as typical in the Discovery Day and other presentations. The Franchisee was unable to maintain income from existing members because of member attrition and failures to pay, and the franchisor's undisclosed policy of not enforcing, or permitting enforcement of, member contracts and payment obligations.

d.    Contrary to the marketing representations, ILKB was unable to "drive traffic to your door"; the ILKB system wide conversion rate was admittedly only about 50 percent, at best; and the Franchisor has admitted that it was unable to make Facebook generate sufficient leads to sustain the Franchisee's business.

10

e.   The representations about marketing costs were simply false:  After the Franchisee purchased the franchise, Ryan Anthony told the Franchisee that it had to spend $10,000 in pre-opening Facebook ads and adopt a monthly marketing plan which was not disclosed in the FDD; he proposed a Facebook budget of $100 per day, far in excess of what was disclosed in the FDD.

f.   The cost to acquire a member was well over $100.  On March 15, 2016, the Franchisee got a message that the franchisor was going to be charging the 1 percent fee for marketing that Mr. Ferrari had said would not be collected.

g.   Contrary to the Franchisor's representations, the business is in fact highly seasonal:  the summer months, as well as the winter holiday months, are dormant.

h.   Members do not stay for a year; they last about three to six months.

i.   Contrary to Mr. Parrella's statement, price is the principal objection to purchasing a membership.  Customers object to ILKB's long-term contracts, while competitors permit customers to buy in smaller, cheaper segments.

j.   The franchisor did not disclose mandatory national marketing spends and giveaways such as giveaways of purple gloves, a monthly DJ night, prizes, and other expenses.

k.   Contrary to the Franchisor's statements that the business could be operated by four to five employees, six to eight are in fact required to run the business on a full schedule because of the heavy phone engagement needed to recruit and retain members; additionally, contrary to Mr. Parrella's statement to Ms. Jarvis at Discovery Day, employee costs are in fact at least a third higher than those quoted by Mr. Parrella.

l.   Contrary to ILKB and FranChoice's representations, the franchise is not suitable for absentee ownership and requires constant attention by the owner.

m.   Training costs are well in excess of those shown in the FDD.  The franchisor requires continuous instructor training at a cost of $299 per person, which was never disclosed.  In addition to initial training, ILKB insists that managers and instructors receive constant retraining.

n.  The East Hanover area of New Jersey was not dense enough to support the business there, as Mr. Parrella subsequently admitted. And, in fact, the franchisor had no data on performance of franchises in New Jersey at the time that Mr. Ferrari said that the demographics were "great" and that the Franchisee should "proceed with confidence."

o.  Item 6 of the FDD does not disclose the $30,000 per year local advertising requirement that is contained in the Franchise Agreement at Section 4.3(d).

p.  Contrary to the representation in Item 3 of the FDD that Mr. Parrella had not been held liable in a civil action involving fraud within the 10 years prior to the registration of the FDD, on September 23, 2004, Mr. Parrella entered into a settlement agreement in an adversary proceeding in his bankruptcy (described below) in which he agreed to pay money to dispose of a claim brought by the Trustee in Bankruptcy alleging that he had fraudulently transferred his ownership interest in two kick boxing companies to a third party.

q.  Contrary to the representation in Item 4 of the FDD that Mr. Parrella had not been adjudged a bankrupt within the prior 10 years, Mr. Parrella had filed for bankruptcy under Chapter 13 of the Bankruptcy Code on or about February 24, 2003; the case was converted to Chapter 7 on or about May 9, 2003; Mr. Parrella was not discharged until January 4, 2008; and the bankruptcy case was not closed until 2013.  Under the FTC Guidelines for disclosure of bankruptcy, a franchisor must disclose in Item 4 of the FDD whether it or a person identified in Item 2 of the FDD has "Obtained a discharge of its debts under the Bankruptcy Code" within the 10-year period immediately before the date of the disclosure document.

## Breach of Contract

25.  In addition, to these misrepresentations and omissions, the Franchisor has breached the Franchise Agreement in at least the following respects:

a.  The franchisor has not effectively run pay-per-click campaigns as it has undertaken to do in Section 10.2; this failing is compounded by the franchisor's refusal to disclose information that would enable the franchisee to use other online advertising platforms, such as Yelp.

b.  It has mismanaged Facebook accounts so that the franchisee has made immense expenditures with no or little return.

12

c.  Franchise training was inadequate to show the franchisee how to actually service customers.

d.  The business model has been changed by increasing and decreasing the square footage for the outlet.  Recently, the Franchisor has announced its intention to make additional material changes to the model (*e.g.*, kids classes, minimum outlet size, pricing, minimum staffing, and various business practices).

## COUNT I
### (Violation of the New York State Franchise Sales Act)

26.  Plaintiffs repeat and reallege all of the allegations set forth in the preceding paragraphs as though fully set forth herein.

27.  The franchisee is a "Franchisee" and the franchisor is a "Franchisor" as defined under the New York State Franchise Sales Act, N.Y. Gen. Bus. L. § 680 *et seq.*

28.  The New York Act applies to the sale of the franchise to the franchisee.

29.  Under the New York Act, it is unlawful for any person, in connection with the offer, sale or purchase of a franchise to directly or indirectly employ any devise, scheme or artifice to defraud; to make an untrue statement of a material fact or to admit material facts; or to engage in any practice or course of conduct that operates or would operate as a fraud or deceit upon any person.  N.Y. Gen. Bus. L. § 687.

30.  FranChoice and Mr. Stevens violated the New York Act in at least the following respects:

a.  FranChoice, through Mr. Stevens, made financial performance representations, including the representation that an ILKB franchise would return the Franchisee's investment within one year; that with 200 customers, the business would break even, and that it was profitable with 300 customers.

b.  ILKB, Mr. Parrella, Mr. Ferrari, FranChoice and Mr. Stevens omitted material information on attrition rates and customer bad debts as well as the fact that the franchisor did not permit franchisees to enforce collection on defaulting members, in violation of N.Y. Gen. Bus. L. § 687.2.

    c.      FranChoice and Mr. Stevens misrepresented that the franchise was suitable for absentee ownership, understated staffing and labor costs, and did not disclose administrative burdens;

31.    In addition, Gen. Bus. L. §687.1 makes it unlawful for any person to make any untrue statement of a material fact in any prospectus or report filed with the Department of Law.  ILKB and Parrella violated Gen. Bus. L. §687.1 by failing to make full and required disclosures in Items 3 and 4 of the FDD and by failing to follow the guidelines for disclosure of financial representations as required by Item 19.

32.    Under Gen. Bus. L. §691.1 the Franchisee is entitled to recover damages and/or rescission as well as attorneys' fees and costs.

33.    The Franchisee is entitled to damages incurred as a result of Defendants' misrepresentations and violations of the act.

### COUNT II
### (Common Law Fraud)

34.    Plaintiffs repeat and reallege all of the allegations set forth in the preceding paragraphs as though fully set forth herein.

35.    Defendants made the misrepresentations and fraudulent omissions set forth above knowing that they were false and with the intent that the franchisee rely upon them to its detriment.  The franchisee justifiably relied upon Defendants' misrepresentations and incurred damages as a result.

36.    The Franchisee is are entitled to recover the losses that it has suffered as a result of Defendants' fraud.

14

## COUNT III
### (Negligent Misrepresentation)

37.   Plaintiffs repeat and reallege all of the allegations set forth in the preceding paragraphs as though fully set forth herein.

38.   Defendants negligently made false representations in the course of the sale of the franchise and that they knew to be contrary to the truth and knowing that the franchisee would rely upon them.

39.   As a result of the Franchisee's reliance upon Defendants' negligent misrepresentations, the Franchisee has incurred damages to which it is entitled to recover.

40.   WHEREFORE, the Franchisee demands damages consisting of the value of its investment, the value of the business, attorneys' fees and such other and further relief as the Court determines.

Dated:  September 13, 2017

**GARNER & GINSBURG, P.A.**

By /s/ W. Michael Garner
W. Michael Garner
5030 Broadway
Suite 631
New York, New York 10033
wmgarner@yourfranchiselawyer.com
(612) 259-4800 (Telephone)
(612) 259-4810 (Facsimile)

**ATTORNEYS FOR PLAINTIFFS**